# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 12, 2011

## STATE OF TENNESSEE v. ALVIN DORTCH

**Appeal from the Criminal Court for Shelby County**
No. 08-06089   Lee V. Coffee, Judge

**No. W2010-01760-CCA-R3-CD  - Filed December 27, 2011**

The Defendant, Alvin Dortch, was convicted by a Shelby County Criminal Court jury of two counts of making a false report, a Class D felony.  See T.C.A.§ 39-16-502(a) (2010).  The trial court merged the convictions and sentenced the Defendant as a Range I, standard offender to three years, with 120 days' confinement and the remainder on probation.  On appeal, the Defendant contends that the trial court erred by denying judicial diversion.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Samuel L. Perkins, Rhonda Hooks, and Taurece Riley (at trial), and Juni S. Ganguli (on appeal), Memphis, Tennessee, for the appellant, Alvin Dortch.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Steve Jones and Nicole Germain, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to the victim's fleeing a traffic stop conducted by the Defendant, who was a Shelby County Sheriff's Deputy.  The Defendant shot the victim's tire, which deteriorated as the victim drove away.  The victim's truck eventually overturned, and the victim was killed.  The Defendant provided false information about the incident to his supervisors.  The Defendant was indicted for one count of reckless homicide, one count of reckless endangerment, three counts of official misconduct, one count of official oppression, and two counts of making a false report.

At the trial, Shelby County Sheriff's Chief Joseph Phillip Ruff testified that he was the director of training for the sheriff's department. His duties involved training officers on the use of deadly force. He said that department policies and state law governed an officer's use of deadly force, that all officers were trained on the policies and required to follow them, and that all officers had to undergo annual training on the use of deadly force. He said firing a gun was considered deadly force. The Defendant completed his annual training on February 26, 2008.

Chief Ruff testified that officers were permitted to use deadly force only when there was an imminent threat of death or serious bodily harm to the officer or when a fleeing violent felon presented an imminent threat to the public, and the officer had exhausted all other reasonable means of apprehending the person. He said officers were permitted to shoot at a moving car in "[o]nly very, very rare, just almost impossible circumstances," such as when a suspect was driving directly at the officer and the officer was unable to get out of the way. He said that a person driving away from a traffic stop did not present such a threat and that department policy did not permit an officer to shoot at a car's tires because it could cause the car to "go out of control and create danger . . . ." A copy of the department policy related to the use of deadly force was introduced into evidence.

Chief Ruff testified that every time an officer fired a gun, he or she was required to notify dispatch of the shooting immediately and request that the nearest on-duty supervisor come to the scene. He said the decision to use deadly force must be based on the facts known to the officer at the time. The department policy stated that, "under no circumstances may commissioned officers fire warning shots or shots to wound," and that "officers may not discharge their weapon at or from a moving vehicle unless it is absolutely necessary to protect a law enforcement officer or other person from death or great bodily harm." He said that he viewed the video of the traffic stop and that the Defendant violated the department's deadly force policy by shooting at the tire of the victim's truck.

On cross-examination, Chief Ruff testified that the Defendant did not attend the training classes that he taught and that he had no firsthand knowledge if the department policies were given directly to the Defendant. He agreed the decision to use deadly force was based on the circumstances known to the officer at the time but said the decision must adhere to the law and department policy. He agreed the policy stated that the reasonableness and practicality of using alternate methods to stop a suspect were based on the circumstances known to the officer at the time the deadly force was used. He agreed the policy stated that officers could use deadly force if they reasonably believed that such force was necessary to prevent imminent death or serious bodily harm to the officer or the public. He said the department policies were based in part on United States Supreme Court decisions banning

the use of deadly force against non-violent fleeing felons, but he agreed the policies did not quote Tennessee state law.

Chief Ruff agreed that he viewed the video recording of the traffic stop which was played for the jury. He agreed several cars drove by the traffic stop. He agreed that additional action would be required if a person suspected of driving under the influence (DUI) failed to obey an officer's orders during a traffic stop. He agreed officers had to assess their safety and that of the suspect and bystanders while conducting traffic stops involving persons suspected of DUI. He agreed that a suspect who made an "abrupt move" could catch an officer off guard and that the officer would have to respond with what he or she considered to be a reasonable action.

On redirect examination, Chief Ruff testified that DUI was a misdemeanor offense if it did not involve an accident resulting in injury or death. He said officers were not authorized to use deadly force to stop a person suspected of misdemeanor DUI from fleeing the scene.

On recross-examination, Chief Ruff agreed that a DUI suspect who fled a traffic stop could be guilty of a felony but said that it would be a non-violent felony. He said that a truck could be considered deadly force if it were "bearing down" on a person.

On further redirect examination, Chief Ruff agreed that "just because [an officer] believes something, that doesn't make it reasonable." He said it was not uncommon for an officer to have to pursue a suspect who fled the scene of a stop or who refused to stop. He said department policy did not authorize the use of deadly force simply because a car fled the scene of a stop.

On further recross-examination, Chief Ruff testified that although a suspect driving a car onto a road with heavy traffic could be considered using deadly force, it was unlikely. On further redirect examination, Chief Ruff testified that the video of the traffic stop did not show circumstances warranting the use of deadly force against the victim.

Shelby County Sheriff's Sergeant Tim McMackin testified that he responded to the scene of a traffic accident a little before midnight on June 28, 2008. When he arrived, he saw the Defendant's police cruiser parked near an upside-down Ford F-150 truck, firefighters, and an ambulance. He took photographs and investigated the scene. He said that the rear left tire of the truck was "totally disintegrated" and that it appeared the truck drove on the flat tire and the rim of the wheel for about one-half of a mile. He identified photographs of the scene and said they showed pieces of a shredded tire and where the truck's wheel scraped the pavement. No rubber remained on the back left wheel of the victim's truck. He identified

additional photographs and said they showed the deceased victim, who remained in the overturned truck, and a baseball cap in the road with what appeared to be tissue in it and blood near it. He did not think the victim wore a seatbelt at the time of the accident.

Sergeant McMackin testified that he spoke with the Defendant after he photographed the scene. The Defendant told Sergeant McMackin that he was conducting a traffic stop when the victim sped past him, that he ended the traffic stop to pursue the victim, that he lost sight of the victim, and that he saw the victim's overturned truck and dust in the air as he approached the Jackson Avenue exit. Sergeant McMackin said the Defendant was not aware that after his police cruiser's video surveillance system was activated, it also recorded the events that occurred during the sixty seconds before activation. He said the Defendant gave him the disk of the video recording. The recording was admitted into evidence. He said that the Defendant also gave him the victim's driver's license but that the Defendant did not tell him that the Defendant stopped the victim's truck. He said that at the time, he did not know how the Defendant obtained the victim's license. Sergeant McMackin never heard the Defendant tell the dispatcher or anyone else that he fired his weapon.

Sergeant McMackin testified that he watched the video recording from the Defendant's police cruiser the next day. He said the recording showed the Defendant firing his weapon twice when the victim fled from a traffic stop and a short pursuit that ended when the victim's truck overturned. He said that the recording was not consistent with what the Defendant told him and that he informed Lieutenant Larry Lindsay of the recording's contents. He said he met Lieutenant Lindsay at the sheriff's department and gave him the video recording. He said the recording did not show anything justifying the use of deadly force.

On cross-examination, Sergeant McMackin testified that on the video recording, the Defendant appeared to be shooting in the direction of the victim's truck. He did not notice that the Defendant shot at a downward angle. He did not know how fast the victim drove when the truck overturned, but he agreed that the Defendant drove about sixty miles per hour and was unable to catch up to the victim before the victim crashed. He agreed the accident occurred as the victim left the highway and drove around a curved exit ramp. He agreed that a car's brakes were not as effective if a tire were missing from a wheel but that the driver could still stop a car. He agreed the Defendant had a casual demeanor when he spoke with the Defendant at the scene.

On redirect examination, Sergeant McMackin testified that he did not "interrogate" the Defendant at the scene because a fellow officer should voluntarily and accurately state what happened. He said the Defendant's shooting out the victim's tire was "definitely" a factor that contributed to the crash.

-4-

Shelby County Sheriff's Sergeant Reginald Reed testified that he worked with the DUI unit and that he was the Defendant's supervisor when he responded to the scene of a traffic accident shortly after midnight on June 29, 2008. The Defendant told Sergeant Reed that he was conducting a traffic stop when the victim sped by, that he pursued the victim, and that he came upon the victim's crashed truck at the Jackson Avenue exit. Sergeant Reed said the Defendant did not state that he stopped the victim or shot at the victim's truck. Sergeant Reed said that he and the Defendant left the scene and went to the sheriff's substation and that he asked the Defendant to write a statement explaining what happened. He identified the Defendant's report and read it to the jury:

> Officer Dortch responded to a crash at I-240 and Jackson . . . I was conducting a traffic stop and test at eastbound 1 east of Watkins when I observed a blue Ford F-150 traveling east at a high rate of speed weaving across the interstate. I went after the truck . . . . As I was advising dispatch of my stop and the vehicle information, the truck pulled away at a high rate of speed. I lost sight of the vehicle for a short time. When I got to Jackson exit, I observed a large cloud of dust and observed the vehicle had overturned and was resting upside-down with the driver, later identified as Ignacio Arcos, unresponsive. A female witness advised she was northbound on Jackson when she observed the accident around - - called 911 when she saw me pull on the scene . . .

He said the report was untruthful and should not have omitted that the Defendant fired two shots at the victim's truck. He said firing a gun was deadly force, regardless of the intended target or what the bullet struck. He said that DUI was a misdemeanor offense and that nothing shown in the video recording of the traffic stop justified the use of deadly force.

On cross-examination, Sergeant Reed testified that because he was the Defendant's supervisor, the Defendant was required to tell him what happened. He agreed that a misdemeanor DUI traffic stop could result in additional charges depending on the actions of the suspect and that the officer on the scene had to use his or her own judgment on how to react based on the situation. He agreed he did not know what occurred during the traffic stop before the video recording began.

On redirect examination, Sergeant Reed agreed that he did not know what occurred during the vehicle stop, other than what was shown on the video recording, because the Defendant did not tell him what happened. In response to a jury question, Sergeant Reed testified that he did not hear what the Defendant said to the dispatcher about the crash.

Doctor Suresh Kari testified that he was the Emergency Room Director at the Veterans Affairs Medical Center. Around midnight on June 29, 2008, he was driving home when he saw an upside-down truck. He stopped his car and walked toward a police officer to offer assistance. He said the officer told him he needed help checking on the victim. He said he saw blood, brain matter, and a "gaping hole" in the victim's head. The victim did not have a pulse and was not breathing. He said he told the officer that the victim was dead.

Doctor Karen Elizabeth Chancellor, an expert in forensic pathology, testified that she was the Chief Medical Examiner for Shelby County. She performed an autopsy on the victim on June 30, 2008. She said that the victim had not been shot but that he had significant injuries to his head and body. She said the cause of death was blunt force trauma to the head. She said that the victim's blood alcohol content (BAC) was .249 and that the alcohol in his blood contributed to his death.

David Freeman testified that he worked for WatchGuard Video and that the company produced in-car digital video systems for law enforcement, including the Shelby County Sheriff's Department. He met with several detectives on June 30, 2008, and was asked to retrieve video from a car's hard drive due to a problem with the original disc. He identified a disc containing the video recording he copied from the hard drive.

Mr. Freeman testified that the video system began recording whenever an officer pressed the record button, activated it using a wireless microphone, or turned on the car's emergency lights. He said the Defendant manually activated the system. He agreed that the system automatically recorded whenever it was powered on, not only when a recording was manually started, and he said that the automatic recordings remained on the hard drive for twelve to twenty-four hours before being overwritten by new recordings. He said that the recording system in the Defendant's car was turned off at 11:59 p.m., before the shooting, and that it was manually started at 12:08 a.m., after the shooting, but that the video system also included the previous sixty seconds of automatically recorded material whenever manually recorded material was transferred to a disc.

In response to a jury question, Mr. Freeman testified that he did not know if the Defendant was aware that the system recorded before the record button was pressed. He said that the video system automatically began saving a recording to the hard drive after the system was powered on, regardless of whether the system was manually activated.

Steve Shular testified that he worked for the Shelby County Sheriff's Public Affairs Office and that his duties included creating press releases about items that concerned the department. He said that on June 29, 2008, he went to the scene of the victim's crash to gather information for a news release. He said he showed the press release to the Defendant

to verify the facts of the incident before he issued the release to the media. He identified the press release and said it was submitted to all local media outlets. It stated:

> A Memphis man was killed early this morning after losing control of his pick up truck on an interstate exit ramp. Just after midnight, a Metro DUI Squad car was parked on the east-bound lane of I-240 near Warford.
>
> The officer had just concluded a sobriety test on a driver when a Ford F-150 driven by Ignacio Arcos, 23, sped past the officer's car. The Deputy contacted Sheriff's Office dispatchers and reported the truck going at a high rate of speed and weaving between lanes.
>
> The DUI officer attempted to follow the truck but lost sight of it. As the Deputy approached the Jackson Avenue exit, he saw tire marks in the grass.
>
> The Deputy exited the interstate and saw Arcos's pick up truck upside down on the exit ramp. Arcos, who was not wearing a seat belt, was dead at the scene.
>
> Sheriff's Office Traffic Investigators believe a tire went flat on the pick up truck moments before it flipped over.
>
> Deputies found several open beer bottles inside the truck cab and near the scene . . . .

Mr. Shular said the Defendant verified the accuracy of the information in the press release but did not state that there was a traffic stop involving the victim or that he pursued the victim.

Mr. Shular testified that he received a telephone call the next day informing him that the Defendant had been placed on administrative leave due to a discrepancy in the Defendant's version of how the crash occurred. He said he created a new press release with the updated information.

On cross-examination, Mr. Shular testified that he was not a commissioned officer and that he did not have law enforcement credentials. He agreed he was sent to the scene to gather basic information about the crash. He agreed the Defendant did not write the press

release but said he allowed the Defendant to read the release and verify it before it was sent to the media. On redirect examination, Mr. Shular testified that he would consider an officer's shooting at a suspect's car to be basic information.

Shelby County Sheriff's Detective Sergeant Raymond Sides testified that he was assigned to view the video recording of the incident involving the victim and to investigate what the police suspected to be a homicide. He met with the Defendant the day after the crash. He said that the Defendant did not want to provide a statement and that the Defendant was relieved of his duties and allowed to leave the sheriff's department. He said the Defendant did not state that he fired his weapon during the incident with the victim. Detective Sides examined the victim's truck, found bullet holes in the rear left wheel and near the top of the truck bed, found a bullet fragment under the bed liner, and photographed the truck. He said there was also "some indication of a strike that hit the brake pad . . ." He said he sent the truck wheel, bed liner, brake pad, and bullet fragment to the Tennessee Bureau of Investigation (TBI) for analysis. He identified TBI reports and said they concluded that a lead projectile passed through the wheel and brake drum. The State and the Defendant stipulated that the bullet holes in the bed liner and the wheel and the bullet found in the bed liner were caused by the Defendant's gun. In response to a jury question, Detective Sides testified that there was no structural damage to the brake drum.

On cross-examination, Detective Sides testified that the Defendant was not under arrest during their meeting and that the Defendant was free to leave. He agreed the bullet holes in the victim's truck were consistent with the Defendant aiming his gun downward while firing. He agreed the brake drum remained capable of stopping the victim's truck.

Shanette Chapple testified that she worked as a communications dispatcher for the Shelby County Sheriff's Department. She said she received a call from the Defendant on June 28, 2008. She identified a recording of the call, which was played for the jury. She said the Defendant told her that he was at the scene of a crash, that he did not know how many persons were in the crashed truck, and that medical and fire personnel needed to come to the scene. She said the Defendant never stated that the victim was dangerous or non-compliant or that he shot at the victim's truck.

On cross-examination, Ms. Chapple agreed that the Defendant told her a truck sped away after he stopped it and that she relayed the information to Sergeant Reed as Sergeant Reed drove to the scene. She agreed the Defendant reported his original location when he stopped the truck near the Warford exit from Interstate 240. On redirect examination, Ms. Chapple agreed that officers had a duty to tell the dispatcher what happened and if they fired their gun.

Todd Hutchison testified for the defense that he worked in Nashville performing motor vehicle accident reconstruction. He agreed he was hired by the defense to reconstruct the scene of the victim's crash. He said that the total distance between where the Defendant stopped the victim's truck and the scene of the crash was 1.428 miles and that the victim drove approximately 1700 feet on the rim of the rear left wheel before crashing. He said the truck crashed after attempting to navigate a sharp curve. He identified diagrams and photographs of the scene that were introduced into evidence. He agreed he watched the video recording of the traffic stop and said the victim's tire began to deflate immediately after it was shot. He said the victim drove approximately one mile before the rim began scratching the pavement.

On cross-examination, Mr. Hutchison agreed that he and the Defendant went to the scene the day after the crash and that the Defendant showed him where the traffic stop and shooting occurred. He agreed he sent a letter to defense counsel stating that the distance between the shooting and the crash was approximately 1.3 miles. On redirect examination, Mr. Hutchison testified that he verified the location of the traffic stop by watching the video recording and noticing consistent landmarks between the location on the recording and the location shown to him by the Defendant.

Jim Wilson, the Shelby County Sheriff's Department director of accreditation, testified that he maintained the policies of the sheriff's department, including policies for the Critical Incident Response Team and the Critical Incident Debriefing Team. He said these teams responded to the scene of critical incidents, such as an incident involving a death or a large accident, to assist the officers involved. He said the teams were governed by department policies. He agreed that if the policy stated that the officers involved in the critical incident were not to be questioned about the incident until a certain time had elapsed, then the policy should be followed.

On cross-examination, Mr. Wilson testified that he would not expect the critical incident policies to be required when an officer said he was alright and failed to tell anyone that he was involved with the death of a person at the scene. Upon this evidence, the jury found the Defendant guilty of two counts of making a false report but acquitted him of the remaining charges.

At the sentencing hearing, Suzanne Renfroe testified that she worked for the disciplinary review section of the Shelby County Sheriff's Bureau of Professional Standards and Integrity and that she maintained disciplinary records for the department. She said that the Defendant was disciplined on April 7, 1992, for carrying an unauthorized semi-automatic pistol and lying to officers about being qualified with the weapon. She said the Defendant

admitted that he lied about the unauthorized pistol and apologized to the disciplinary board during a hearing. She read a memorandum of the hearing, which stated that

> when Officer Dortch was questioned about various points in his testimony, he was unable to respond with a believable explanation. Officer Dortch would compound his breach of trust by changing his story to something even more unbelievable. It soon became apparent that Officer Dortch was fabricating a story and when confronted with this fact, he was incapable of retracting his testimony. Although later in the hearing, Officer Dortch did apologize to the board for lying to them. In conclusion, the board felt that they never did hear the truth from Officer Dortch and recommended that he be given a written reprimand . . . . The board also recommended that Officer Dortch be charged with another count of RR3.537B, truthfulness, for his testimony during the hearing.

Ms. Renfroe testified that the Defendant was disciplined on October 17, 1997, for firing too many rounds during a firearms qualification and claiming that it was accidental. She read a letter written by J.P. Tucker, an internal affairs inspector, about the incident. The letter stated Inspector Tucker's belief that "after failing both his day post courses and both his day shotgun courses . . . Dortch was intentionally cheating on the night course in an attempt to pass."

On cross-examination, Ms. Renfroe testified that the memorandum relating to the unauthorized weapon incident did not state that the Defendant knew the weapon was unauthorized when confronted by his superior. She said that after the second incident involving the firearms qualification, the Defendant was allowed to requalify and return to a sheriff's deputy position.

John Davis testified on behalf of the defense that he had known the Defendant for twenty-nine years. He said that he was willing to help ensure that the Defendant fulfilled any conditions of probation or diversion and that he thought the Defendant would comply with any conditions imposed by the court.

Ophelia Dortch testified that she had been married to the Defendant for twenty-nine years and that they had two sons. She said that she attended every hearing in this case and that she would ensure that the Defendant fulfilled any conditions of probation or diversion.

The Defendant testified that he was not employed at the time of the sentencing hearing but that he attended online classes to earn a degree in nuclear medicine. He said he began earning his degree before the incident in this case. He said that he attempted to find alternate employment after being relieved of duty at the sheriff's department but that no one wanted to hire him while the case was pending. He said that he wished he had acted differently after the incident and that it was his responsibility to accept the jury's verdict. He said he hoped the court would grant him diversion and allow him to become an asset to the community. He said he would comply with any conditions placed on him by the court.

On cross-examination, the Defendant testified that he did not tell anyone he shot at the victim's truck and that he accepted responsibility for making a false report. He said he did not think he contributed to the victim's death. He said he had been working double shifts at the time and was mentally and physically exhausted. He agreed he was required to tell his supervisor that he fired his weapon but said a Critical Incident Response Team should have responded to the scene to help him cope with the stress of the situation. He agreed he never requested the team but said he was not required to ask for their assistance. He said he knew it was against policy to shoot at a moving vehicle. He said that he expected his supervisors to instruct him to go directly to the sheriff's department after the incident to give a full account of the crash but that they never did. He agreed he should have told his superiors that he fired his gun and said he had no excuse for his failure to do so.

On questioning from the court, the Defendant agreed that he worked for six weeks as an armed security guard after the incident in this case but said he stopped working when he resumed his online classes. He agreed he told a presentence investigator that he was "just doing his job" when he shot at the victim's truck. He said that the victim was extremely intoxicated and that he could not allow the victim to endanger the public. He agreed department policy did not allow him to shoot at the victim's truck after the victim left the scene of the DUI stop.

The trial court noted that the Defendant was eligible for an alternative sentence. It found mitigating factor (11) applicable. See T.C.A. § 40-35-113(11) (2010) ("The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct"). The trial court found enhancement factors (6), (9), (10), and (14) applicable. See T.C.A. §§ 40-35-114(6) (2010) ("The personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great"), -114(9) ("The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense"), -114(10) ("The defendant had no hesitation about committing a crime when the risk to human life was high"), -114(14) ("The defendant abused a position of public or private trust"). Although we do not think enhancement factors

(6), (9), and (10) were appropriately applied to enhance the length of the sentence for the offense of making a false report, we conclude that the Defendant's abuse of a position of public trust, even when considered in light of the mitigating proof, supported the Defendant's three-year sentence. Also, the circumstances surrounding the offense were properly considered in determining whether to grant judicial diversion.

The trial court denied judicial diversion after finding that the circumstances of the offense, the Defendant's amenability to correction, the deterrence value to the Defendant and others, and the interests of the public weighed against granting diversion. The trial court merged the convictions and sentenced the Defendant as a Range I, standard offender to three years, with 120 days' confinement and the remainder on probation. This appeal followed.

The Defendant contends that the trial court erred by affording undue weight to factors not favoring judicial diversion, failing to explain why those factors outweighed factors in favor of diversion, and failing to find and give proper weight to the fact that this was an isolated incident of misconduct. He also argues that the trial court abused its discretion by focusing solely on the nature and circumstances of the offense in denying diversion and by requiring the Defendant to accept responsibility for his actions as a prerequisite to eligibility for diversion. The State contends that the trial court considered all the required factors and did not abuse its discretion in denying judicial diversion. We agree with the State.

A defendant is eligible for judicial diversion if he or she is found guilty of or pleads guilty or nolo contendere to a Class C, D, or E felony or a lesser crime, has not previously been convicted of a felony or a Class A misdemeanor, and is not seeking deferral for a sexual offense. See T.C.A. § 40-35-313(a)(1)(B)(I) (2010). The decision to grant judicial diversion lies within the sound discretion of the trial court, and this court will not disturb that decision on appeal absent an abuse of discretion. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). Upon review, we will give the trial court the benefit of its discretion if "'any substantial evidence to support the refusal' exists in the record." State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992) (quoting State v. Hammersley, 650 S.W.2d 353, 356 (Tenn. 1983)).

In determining whether to grant judicial diversion, the trial court must consider (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; (6) the deterrence value to the defendant and others; and (7) whether judicial diversion will serve the ends of justice – the interests of the public as well as the accused. Electroplating, 990 S.W.2d at 229; State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). In addition, "the record must reflect that the court has weighed all of the factors in reaching its determination." Electroplating, 990 S.W.2d at 229. If the trial court

refused to grant judicial diversion, it should state in the record "the specific reasons for its determinations." Parker, 932 S.W.2d at 958-59.

The record reflects that the trial court considered each of the required factors and made extensive findings in support of its determination to deny judicial diversion. With regard to the Defendant's amenability to correction, the court found that although the Defendant had never been charged with a crime before this incident, the Defendant had a history of being untruthful while serving as a commissioned officer and that his lack of honesty was the reason for the conviction. It noted that the Defendant was not candid with the court when he told the presentence investigator that he had no history of military service and no physical or mental issues, but then told defense counsel that he was honorably discharged from the marines because he had Crohn's Disease. It also noted that although the Defendant originally stated he was unable to find employment after being relieved of duty, he later admitted that he worked as a security guard but quit to resume classes. The court found that the Defendant's lack of candor and history of being untruthful weighed heavily against diversion.

With regard to the circumstances of the offense, the trial court found that the Defendant endangered the lives of the victim and the public when he shot at the victim's moving truck and lied about the incident. The court gave great weight to this factor. The trial court found that the Defendant's lack of a criminal record, his social history, and his physical and mental health weighed in favor of diversion. The court found that granting diversion would not act as a deterrent to the Defendant or others and awarded great weight to this factor after finding that false reports were increasingly prevalent in the community, the crime was the result of intentional and knowing conduct, the crime received substantial publicity, and the Defendant previously engaged in dishonest conduct while performing official duties. The trial court also found that judicial diversion would not serve the interests of the public and the ends of justice because it would send a message that officers can "hide behind" their badges and would imply that the Defendant's conduct was acceptable.

As noted above, the court found that the Defendant's amenability to correction, including his lack of candor with the presentence investigator and his history of being untruthful while serving as a commissioned officer, weighed heavily against diversion. The Defendant's lack of candor with the court and his dishonesty are "sufficient to give the trial court the benefit of discretion" with regard to its decision to deny diversion. See State v. Dowdy, 894 S.W.2d 301, 307 (Tenn. Crim. App. 1994). The court also found that the circumstances of the offense, the deterrence value to the defendant and others, and the interests of the public weighed against granting diversion. The trial court placed great weight on the Defendant's lack of amenability to correction, the circumstances of the offense, and the deterrence value of denying diversion. Its holding implicitly finds that these weighted

factors, along with the interests of the public, outweighed the Defendant's lack of a criminal record, his social history, and his physical and mental health.

The Defendant claims that the trial court should have found that this was an isolated instance of misconduct and weighed this factor in favor of judicial diversion. We disagree. The trial court noted that the proof at the sentencing hearing established that in addition to the false reports forming the basis of these convictions, the Defendant had at least two previous instances of dishonesty while serving as a commissioned officer. With regard to the Defendant's claim that the trial court erred by requiring the Defendant to take responsibility for his actions as a prerequisite to eligibility for diversion, the trial court specifically noted that "Under Tennessee law, he does not have to accept responsibility. He does not have to admit guilt of anything in order to ask this Court for diversion or probation . . . ." The trial court did not require the Defendant to express guilt or take responsibility as a prerequisite to receive diversion. Furthermore, the record reflects that the trial court did not focus solely on the nature and circumstances of the offense in denying diversion. The record reflects that the trial court considered each of the required factors in determining whether to grant judicial diversion and that the trial court made findings with regard to each factor that were supported by the record. We conclude that the trial court did not abuse its discretion in denying judicial diversion. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE